PHILLIP A. TALBERT
United States Attorney
HEIKO P. COPPOLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

DMITRIY SLAVIN
Trial Attorney
National Security Division
U.S. Department of Justice
Washington, D.C.

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:21-CR-00040 KJM |
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S FORMAL PSR OBJECTIONS AND SENTENCING MEMORANDUM |
| v. | |
| MURAT KURASHEV, | DATE: April 29, 2024 |
| Defendants. | TIME: 9:00 a.m. COURT: Hon. Kimberly J. Mueller |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S FORMAL PSR OBJECTIONS AND SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................................1

II.  FACTUAL AND PROCEDURALS HISTORY ...................................................................1

    A.  Procedural History ........................................................................................................1

    B.  Factual History..............................................................................................................2

        1.  Overview ...............................................................................................................2

        2. Kurashev's consumption of violent extremist content and interest in
weapons...................................................................................................................3

        3.  Kurashev's interest in traveling to Syria and Turkey ....................................5

        4.  Internet use obfuscation ......................................................................................6

        5.  Kurashev's radicalization....................................................................................6

III.  KURASHEV'S FORMAL PSR OBJECTIONS ...................................................................8

    A.  The Probation Officer correctly applied the Advisory Guideline provisions .....................8

    B.  U.S.S.G. § 3A1.4 applies to Kurashev......................................................................10

    C.  U.S.S.G. § 3A1.4 does not violate due process .........................................................13

    D.  Paragraph 7 ...................................................................................................................14

    E.  The PSR correctly concludes that there are no factors warranting a departure .................14

IV.  UNITED STATES' SENTENCING RECOMMENDATION .......................................15

    A.  18 U.S.C. § 3553(a) Factors ......................................................................................15

    B.  A 240 month sentence is warranted ..........................................................................15

        1.  Nature and circumstances of the offense ........................................................15

        2.  History and characteristics ................................................................................16

        3.  Seriousness of the offense, respect for the law and just punishment....................17

        4.  Unwarranted sentencing disparity ...................................................................17

V.  CONCLUSION......................................................................................................................18

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*United States v. Alhaggagi,*
    978 F.3d 693  (9th Cir.  2020) ................................................................................... 11, 12

*United States v. Awan,*
    607 F.3d 306 (2d Cir. 2010) .......................................................................................... 12

*United States v. Giampietro,*
    614 F. Supp. 3d 612 (M.D. Tenn. 2022) ....................................................................... 13

*United States v. Jameson,*
    EDCA No. 1-18-CR-00001 LJO ................................................................................... 17

*United States v. Meskini,*
    319 F.3d 88 (2d Cir. 2003) ............................................................................................ 14

*United States v. Teausant,*
    EDCA No. 2:14-CR-00087 JAM .................................................................................. 17

## STATUTES

18 U.S.C. §2339C ............................................................................................................... 13

18 U.S.C. § 2332b(g)(5) ...................................................................................................... 10

18 U.S.C. § 2339A .............................................................................................................. 12

18 U.S.C. § 2339B .............................................................................................................. 10

18 U.S.C. § 2339B(a)(1) ....................................................................................................... 1

18 U.S.C. § 2339B(g)(6) ....................................................................................................... 3

18 U.S.C. § 3553(a) ............................................................................................................. 15

## RULES

Fed.R.Crim.P. 11(c)(1)(C) ................................................................................................. 17

## SENTENCING GUIDELINES

U.S.S.G. § 3A1.4 ..................................................................................................... 10, 14, 15

PHILLIP A. TALBERT
United States Attorney
HEIKO P. COPPOLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

DMITRIY SLAVIN
Trial Attorney
National Security Division
U.S. Department of Justice
Washington, D.C.


Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:21-CR-00040 KJM |
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S FORMAL PSR OBJECTIONS AND SENTENCING MEMORANDUM |
| v. | |
| MURAT KURASHEV, | DATE: April 29, 2024 TIME: 9:00 a.m. COURT: Hon. Kimberly J. Mueller |
| Defendants. | |

## I.    **INTRODUCTION**

The United States, by and through the undersigned, submits the memorandum in response to the defendant Murat Kurashev's ("Kurashev") formal PSR objections and in support of its 240 month sentence, followed by an appropriate term of supervised release.

## II.    **FACTUAL AND PROCEDURALS HISTORY**

### A.    **Procedural History**

Kurashev was charged in a single-count indictment with Attempting to Provide Material Support to a Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1). ECF 1. On January 9, 2024 Kurashev pleaded guilty as charged to the indictment without a plea agreement.

B.  **Factual History**

1.    Overview[1]

Kurashev is a Russian citizen who has no lawful status in the United States and at the time of his arrest in February 2021 was the subject of immigration removal proceedings.  Kurashev and his family entered the United States through Mexico.  Between in or about July 2020 and February 2021, while in the Northern and Eastern Districts of California, Kurashev used money transfer services to send approximately $13,000 to two known couriers of Farrukh Fayzimatov, who is a fundraiser for Hay'at Tahrir al-Sham (HTS), a designated foreign terrorist organization located in Syria.

From review of social media and encrypted mobile messaging discussions between Kurashev and Fayzimatov, it is clear they equate providing money in support of the foreign terrorist organization's fighters as tantamount to being engaged in violent jihad.  During these conversations with Fayzimatov, **Kurashev mentioned that he wished he could join the fight in Syria as a mujahideen and regretted that he could only provide financial support**.[2]  The conversations between Fayzimatov and Kurashev make clear that Kurashev was fully aware of Fayzimatov's support of  HTS and his violent extremist ideology.  Additional evidence seized by the FBI revealed that Kurashev followed Fayzimatov's on-line presence and various social media accounts.  Some of Fayzimatov's social media accounts that were viewed by Kurashev included solicitations for money to purchase military equipment, boots, clothing, firearms, and, in one case, a motorcycle, which according to Fayzimatov, would help the fighters avoid bombs and strengthen the frontlines.  In a follow-up video by Fayzimatov announcing the purchase of the motorcycle and an assault rifle, Fayzimatov was recorded writing Kurashev's alias "Abu Salim" on the motorcycle and reminding his audience that donating for the purchase of the motorcycle was tantamount to participating in the frontlines of the war in Syria.  Kurashev's name and information were even provided to an undercover law enforcement operative by Fayzimatov as a means to facilitate funds

---

[1] The United States incorporates by reference the federal search warrant found at KURASHEV_SENSITIVE_00041957-00042048, which was previously provided to Kurashev during discovery and to the Court during the pre-trial detention litigation.  It can also be found at 2:21-SW-0211 JDP.

[2] Emphasis added.  Certain quotations herein are taken from draft transcripts of communications or content that have been translated by certified linguists and are related in substance and part only.

reaching Fayzimatov.  *See* Affidavit 28.  Fayzimatov described Kurashev as a "good and trustworthy

brother."  *See* Affidavit 30.

The FBI also located evidence on Kurashev's phone that shows that on or about February 10,

2021, Kurashev transferred $200 worth of Bitcoin directly to a wallet for Fayzimatov.  Fayzimatov sent

the wallet address directly to Kurashev via an encrypted mobile messaging application on the same day.

Kurashev responded, "sent."  While the Government has not charged him with obstruction, Kurashev

deleted these messages from his cellular device.  The FBI recovered the messages that Kurashev deleted.

Although he was working in construction and not detained in-custody by Immigration and

Customs Enforcement (ICE) prior to his arrest on this indictment, Kurashev's conditions of release

required that he wear an ankle location monitor.  Other than his wife and four children, Kurashev has no

apparent, deeply held connections to the United States or the Eastern District of California, and his other

immediate and extended family members reside overseas.

2. Kurashev's consumption of violent extremist content and interest in weapons

The FBI's review of Kurashev's electronic devices seized at the time of his arrest and his online

accounts revealed that Kurashev has demonstrated a sustained commitment to the consumption of

violent extremist content; he was even in direct contact with at least one of the individuals featured in

the terrorist videos that he consumes: Fayzimatov.  Among the numerous videos found on Kurashev's

devices and in his online accounts is content that the FBI assesses is of HTS, with which Fayzimatov is

affiliated.  One such HTS video contains imagery of fighters, weapons, first-person shooting footage and

other violent extremist content.  Another video found by the FBI depicts an individual, presumably

Kurashev, driving down Interstate 80 watching approximately 51 seconds of the above-described video

in his vehicle.  Kurashev's devices also contained evidence of his frequent access to a website that,

among other content, displays videos of HTS members and paramilitary operations, such as videos

depicting shooting, fighters, and trenches dug in the vicinity of Idlib, Syria.  The website also featured

videos titled in Russian such as: (1) Faruk Shami[3]  – Interview with official representative of HTS Abu

---

[3] "Faruq Shami" is an alias used by Farrukh Fayzimatov.  At the time of the indictment,
Fayzimatov was a known fundraiser for HTS. At all times relevant to the offense conduct, HTS was a
designated foreign terrorist organization as defined in 18 U.S.C. § 2339B(g)(6).  Farrukh Fayzimatov
later became individually designated as a Specially Designated Global Terrorist for his fundraising and
recruitment activities on behalf of HTS in July 2021.  Fayzimatov's designation pursuant to E.O. 13224,

GOVERNMENT'S FORMAL OBJECTION
RESPONSE AND SENTENCING MEMO

3

Khalid Shami; (2) Faruk Shami – Every person has the duty to fight with their soul (23.10.2019); (3) Interview with Amir HTS – Abu Muhammad Julani[4] (voiced in Russian); (4) Faruk Shami with the HTS Storm Troopers Squad; and (5) Overview of a Mujahid's Armor, wherein Fayzimatov explained the cost of the tactical attire and rifle held by a fighter in the video and stated anyone who would like to participate in arming the mujahid could pay for a full set of armor or contribute towards the purchase of armor. Notably, the cost is far lower than what Kurashev sent to Fayzimatov.

In addition to his active consumption of violent extremist media content, the FBI found evidence that suggests Kurashev may have been contemplating additional mechanisms for material support— beyond money— whereby he could engage in jihad.  The FBI discovered that on or about February 1, 2021, Kurashev conducted a Google search for "devtac ronin," which is believed to be a reference to the DevTac Ronin ballistic helmet.  Kurashev then visited the following websites: bulletproofzone.com, securityprousa.com, amazon.com, devtacdesigns.com, and batmanfactor.com.  On one of Kurashev's social media accounts, the FBI also found a message from Safe Life Defense providing information about a body armor bundle that included the following: 2 NIJ certified level IIIA + panels, 2 (ICW) Level IV rifle plates, 1 tactical carrier for overt wear, and 1 concealed carrier for covert wear.  Further examination of Kurashev's electronic devices revealed additional evidence in these categories, specifically with respect to: (1) messages about a rifle scope with night-vision capability from Outdoor Optics, which is company that sells tactical and hunting equipment; (2) what appears to be the purchase using Kurashev's credit card and subsequent use of a Virtual Private Network (VPN) to view the Outdoor Optics website; (3) a German language Google search for the term "one piece of advice for every terrorist" along with a Google search in English for the term "armour helmet send to another country," and the English to Russian translation for "rifle" and "jamming;" (4) a Facebook message advertising infrared night sights with HD recording; (5) a visit using a different VPN to securelyfe.com, a website that appears to sell night vision scopes.   The FBI does not know at this time if Kurashev was

---

as amended, was for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods, or services to or in support of HTS.  Kurashev directly communicated with Fayzimatov via social media and encrypted messaging platforms and used intermediaries provided by Fayzimatov to send funds to HTS.

[4] Muhammad al-Julani is currently the leader of HTS.

planning to purchase these items for use in the United States or to send this equipment and/or body armor overseas for use by the foreign terrorist organization.

YouTube videos viewed by Kurashev's account included content concerning: (1) numerous references to terrorists and terrorist attacks, (2) ideological extremism, (3) Faruq Shami, (4) VPN functionality, (5) how law enforcement agencies track smart phones, (6) fictitious marriage to obtain citizenship, and (7) numerous videos pertaining to marrying a second wife. Kurashev's account also viewed numerous videos about weapons including: (1) handguns, (2) drones, (3) tanks, (4) combat helicopters, (5) bulletproof helmet, (6) mortars, (7) artillery, (8) shahids[5] at the judgement day, and (9) what happens if you mix red lead and aluminum powder. Kurashev's account searched YouTube for: (1) kamikaze drones, (2) katana sword, (3) how to exchange Bitcoin for real money, (4) red lead bomb, and (5) is it allowed to send armor to another country.

### 3. Kurashev's interest in traveling to Syria and Turkey

In or around September 2020, Fayzimatov provided advice to Kurashev about life in Syria. It appears that Kurashev inquired of Fayzimatov about purchasing a residence in Syria. Fayzimatov wrote, "Allah helps everyone who comes to fight in his name." *See* Affidavit at 23. Additionally, in or around October 2020, **Kurashev wrote to Fayzimatov that he felt sad very often because he [Kurashev] did not join the mujahids,[6] and that his heart longed for the ribats [fortifications].[7]** *See* Affidavit at 38. In or around November 2020 (*See* Affidavit at 41), Kurashev wrote, "Inshallah in time I will join you […] I dream about joining you […] jihad is difficult, but the reward is great." *See* Affidavit at 42.

In 2020 and early 2021, Kurashev's account repeatedly searched YouTube for terms in Russian or English such as: (1) Idlib Syria, (2) Syrian Arabic, (3) how to become a farmer in Turkey, (4) best places to live in Turkey, (5) business in Turkey, (6) Germany or Turkey. Kurashev's account viewed

---

[5] "Shahid" is an Arabic word for martyr and is frequently used by violent extremists to describe their desire to die in the service of their cause.

[6] Mujahid is an Arabic term which refers to one who engages in jihad. Jihad is an Arabic word meaning "struggle." In a violent extremist context, jihad has militaristic connotations and can refer to warfare, fighting, or other acts of violence against people or groups deemed to be enemies of fundamentalist interpretations of Islam promulgated by various designated foreign terrorist groups, to include HTS.

[7] Emphasis added.

YouTube videos about: (1) Syria, (2) learning Syrian dialect Arabic, (3) the conflict in Syria, (4) the border with Syria, (5) real estate in Turkey, (6) Russian military operations in Turkey, (7) Turkish weapons and their cost in 2019, and (8) numerous other videos about living and working in Turkey.

### 4. Internet use obfuscation

Many members and supporters of extremist organizations routinely promote the use of mobile messaging applications with end-to-end encryption, VPN use, and other operational security measures to thwart law enforcement detection. Fayzimatov also regularly advised his viewers and social media followers to employ operational security measures; in January 2021, Fayzimatov announced a decision to hold a contest where whenever they purchased a weapon or motorcycle, they would write the name of one of the donors on it. Contest winners would be chosen in part based on the level of operational security employed when transferring the money, such as using cryptocurrency. Kurashev was selected as one of the winners, and in early February 2021, Fayzimatov posted a video writing Kurashev's teknonym on a motorcycle. Evidence obtained from a review of Kurashev's accounts and devices revealed Kurashev's account searched YouTube for: (1) how does a VPN work on android, (2) to use Telegram safely, (3) phone without SIM and Telegram, and (4) how to send money through Western Union online. Furthermore, as previously noted, Kurashev demonstrated sophistication in obfuscating his activity through the use of a VPN and encrypted messaging applications. Fayzimatov advised Kurashev, among other things, to conceal his identity when using or communicating over the internet, and Kurashev used an unattributed phone number with a UK country code. *See* Affidavit at 44.

### 5. Kurashev's radicalization

Kurashev's communications further indicate that Kurashev became steadily more radical in his support for violent extremism during the approximately six months leading up to his arrest. In fact, one day prior to his arrest, Kurashev communicated directly with Fayzimatov on an encrypted mobile messaging application. Fayzimatov reached out to tell Kurashev he would be livestreaming shortly, and about two hours later, Kurashev remarked enthusiastically about Fayzimatov's livestream once it concluded. At one point in their messaging exchange, Fayzimatov wrote, "If you decide to do it [invest in one of Fayzimatov's projects], **trust in Allah, knowing that you are using your assets to carry out**

1  **jihad."[8]**  Kurashev responded, "Yes, brother, I am trying to act with only this intent."  Later,

2  Fayzimatov asked, "Do you know how much we spent on one operation here?  At least $200,000."

3  Kurashev replied, "I know that it's costing a lot of money […] War is an expensive pleasure. […] **I**

4  **hope we become shahids and recollect these days with a smile on our faces**."[9]  Kurashev deleted

5  these messages from his cellular device.

6       Given Kurashev's increasing radicalization over time, the FBI assesses that had he not been

7  arrested, he may have become an operational participant in terrorist activities.  Although there is no

8  method to fully quantify the extent of Kurashev's radicalization, the FBI can assess his observed

9  behaviors within the context of mobilization indicators.  *See* US Violent Extremism Mobilization

10  Indicators (2021 Edition).[10]  These indicators were developed from FBI terrorism investigations, peer-

11  reviewed academic studies, and analytic exchanges between the intelligence community and law

12  enforcement professionals.  In summary, the FBI assesses that Kurashev meets the following

13  mobilization indicators to violence, including, among others:

14     -  (1) Planning or preparing to travel abroad to join a violent extremist organization,

15     -  (2) Unusual [research of] military style tactical equipment (i.e. body armor),

16     -  (3) Increased use of online concealment tactics,

17     -  (4) Directly communicating or developing a relationship with violent extremists or being
18       contacted by them,

19     -  (5) Sending financial resources to violent extremists,

20     -  (6) Expressing a desire to die for a violent extremist ideology, and

21     -  (7) Excessively consuming online violent extremist content, including videos, narratives, and
     other media.

22       Kurashev's behavior firmly places him on the continuum for mobilizing to violence.

23       Upon his release from federal prison, should the Kurashev not "de-radicalize" and reject violent

24  extremist ideology, the United States believes Kurashev meets two additional mobilization indicators to

---

25      [8] Emphasis added.

26      [9] Emphasis added.

27      [10] Available at
https://www.dni.gov/files/NCTC/documents/news_documents/Mobilization_Indicators_Booklet_2021.pdf (accessed on May 18, 2023).

28

violence: (1) having to cope with existing, new, or changing personal circumstances, including personal relationships, family dynamics, employment and (2) presence of real or perceived injustice of a feeling of being wronged (grievances), which may be broad or specific to a person, group, or event. The prospect of a 20-year term of incarceration threatens to effectively eliminate Kurashev's ability to travel, communicate with and provide additional money to a foreign terrorist group, or to be with his family for the foreseeable future. Because of his crime and the likelihood of deportation following his prison sentence, Kurashev will likely not witness his children grow up. These stressors, when coupled with his violent ideology, make him extremely dangerous and a volatile threat to the community following his release from custody. FBI Director Christopher Wray's observation, "Homegrown violent extremists provide few dots to connect and can move from radicalization to mobilization rapidly, using easily accessible weapons and soft targets," is also highly relevant here, particularly given Kurashev's direct communication with Fayzimatov.[11]

### III.    KURASHEV'S FORMAL PSR OBJECTIONS

#### A.    The Probation Officer correctly applied the Advisory Guideline provisions

Both the PSR and Kurashev correctly identify the Guideline provisions at issue. They correctly identify § 2X1.1 as the proper guideline because Kurashev was charged with an attempt to provide material support. They also correctly note that § 2X1.1 uses the base offense level of § 2M5.3, which is 26, plus any specific offense characteristics from the guideline that are determined to have been specifically intended or actually occurred.

Where Kurashev is wrong, and the PSR correct, is in the application of the enhancement in § 2M5.3(b)(1)(D) and (E). Through the multiple hearings in this case, the Government has established with reasonable certainty that Kurashev intended to provide funds to purchase dangerous weapons and firearms, and his funds likely did purchase dangerous weapons and firearms. These weapons were not for show; they were intended to be used in the commission of violent acts against the Syrian army and other opponents of HTS.

---

[11] "Worldwide Threats to the Homeland: Statement for the Record"|17 September 2020| www.fbi.gov/news/testimony/worldwide-threats-to-the-homeland-091720| stated in a U.S. House of Representatives Homeland Security Committee hearing in September 2020

As described above, Kurashev's interest in supporting Fayzimatov went far beyond his media work. Kurashev longed to be part of the fight but in lieu of being in Syria, provided money to outfit he fighters who were there. He responded to Fayzimatov's direct solicitations of funds for weapons. One donation stands out: Fayzimatov purchased a motorcycle and an assault rifle using donated funds, then wrote Kurashev's kunya, an alias used in the fight, on the motorcycle to thank him for the donation. It was Kurashev's funds that purchased the motorcycle.

Kurashev admitted to supporting Fayzimatov's media work, and some of his donations, such as the "Umma Life" project he supported right before being arrested, were clearly for that work. But Fayzimatov's primary goal was to raise money for HTS; the media work he was doing was to increase his reach to find yet more HTS donors. The website where he solicited funds prominently featured HTS militants and fighting scenes. On it, he posted a video handing cash directly to Abu Dirar, who he explained is an HTS member collecting money for the military wing of the organization.

Kurashev knew that his donations would go to the military wing of HTS, and he intended them to do so. Fayzimatov's fundraising account was called "Snaryadi," meaning "shells," which are tools of the military not of journalists. On January 16, 2021, he sent Kurashev a video promoting a new fundraising campaign in which he talked about past fundraising successes, bragging that the funds paid for over 10 motorcycles for the mujahids, helped over a hundred orphans and widows, and equipped over a hundred mujahids. Kurashev did not react to this video by expressing disappointment, surprise or anger that none of his money went to buy the cameras or filming equipment he discusses in his letter to the Court. Instead, he passed the video on to someone he thought was a fellow supporter (the NYPD cyber operative) with instructions to access Muhajeer directly and contact Fayzimatov on his new Telegram account. Likewise, when Fayzimatov contacted Kurashev asking where he wanted $200 worth of Bitcoin Kurashev provided to go (for reasons of properly recording the transaction for bosses an "independent" journalist would not have), Kurashev did not tell Fayzimatov to use it for cameras or film equipment. He responded: "I don't know where you want it to go. You asked me for it, so I sent it to you." This was in February 2021, a month after Fayzimatov mentioned using money to equip over a hundred mujahids and long after his video handing cash to an HTS military leader. Yet Kurashev put no limits on Fayzimatov's use of the money.

Kurashev donated $13,000 through intermediaries to man whose shopping list prominently features weapons for $430 each.  He put no limits or restrictions on how that money is to be used.  He now pretends to be blind as to how Fayzimatov was using that money, but Fayzimatov never hid his true intentions.  Kurashev intended some of his money to support the fight and, considering all the evidence presented in this case, the chance that none of his $13,000 bought weapons is infinitesimally small.  Kurashev knew that, and he continued to send money regardless.

The Government has shown with reasonable certainty that Kurashev provided funds "with the intent, knowledge or reason to believe" that they would be used to purchase dangerous weapons, firearms, and explosives.  There is no speculation over what Fayzimatov would do with the money if it reached him – he makes his intentions quite clear and Kurashev specifically intended for him to achieve his goals.  The money was intended to go to fund dangerous weapons, firearms and explosives, as required by § 2M5.3(b)(1)(D), and to be used in the commission of violent acts, as required by § 2M5.3(b)(1)(E).  The PSR is therefore correct in applying a two-level enhancement in Paragraph 37, and Kurashev's objection to that paragraph should be overruled.

### B.    U.S.S.G. § 3A1.4 applies to Kurashev

The terrorism enhancement in U.S.S.G. § 3A1.4 fits Kurashev like a glove.  The enhancement applies where the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism."  The term "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5).  The definition is in two parts: first, the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Second, it must be a violation of an enumerated statute.  The statute of conviction here, 18 U.S.C. § 2339B, is an enumerated statute.  Accordingly, the only question is whether the offense here was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

By Kurashev's own admission, it was.  When meeting with probation, Kurashev described his motivation for the offense as follows:

> I saw all the abuses Russia did to me and my community, how the Russian government

treats vulnerable people. When Russia started helping the Syrian government commit human rights abuses against the Syrian people, I felt I needed to do something to try to help, and thought that if more people knew how horribly Syrian civilians were treated, the international community would stop them. PSR at ¶ 34.

His actions were in direct response to the actions of the Russian and the Syrian governments and were meant to change the behavior of the Syrian government.[12]  And HTS was the perfect way to achieve that goal.  As Kurashev acknowledges, unlike globally focused terrorist organizations, "HTS is geographically focused on and in Syria and the surrounding region." ECF 153 at 8.  While HTS speaks out against Israel and the West, its primary focus is on fighting the Syrian government.  As discussed above, Kurashev contributed to HTS's military goals in response to campaigns calling for donations to purchase weapons, armor, and other military supplies.  These supplies would equip HTS fighters with weapons, armor, and suicide bombs to fight these governments.

This case is distinguishable from *United States v. Alhaggagi*, 978 F.3d 693  (9th Cir.  2020).  In *Alhaggagi,* the defendant created social media and email accounts for Government sources and undercovers pretending to be ISIS members. 978 F.3d at 696. Alhaggagi was evaluated as an "immature young man" who "demonstrate[d] a lack of ideological commitment to jihad." *Id*. at 697. The Ninth Circuit rejected the enhancement because "one can open a social media account for a terrorist organization without knowing how that account will be used." *Id*. at 702.  While Alhaggagi participated in an ISIS chatroom, the Ninth Circuit found that there was no evidence that he saw the violent anti-American posts in that chatroom, acted based on those posts, or interacted with their authors. *Id.* at 703.

Kurashev and Alhaggagi are polar opposites.  Alhaggagi was an immature young man with no ideological commitment to jihad.  Kurashev is a world-experienced man in his 30s who voiced his support for violent battle, yearned to be a part of it, and had religious conversations about the merits of

---

[12] There is no doubt that the Russian and Syrian Governments were committing horrific acts in Syria. But the righteousness of Kurashev's desires to change those governments' behaviors and retaliate for their actions is not relevant. It is his methods—providing money to a foreign terrorist organization to fight those governments—that are key.

providing money in lieu of fighting.  Alhaggagi was not proven to have read or reacted to the ISIS posts in the chatroom he was in.  Kurashev was proven to have voraciously consumed Fayzimatov's violent propaganda, happily replaying it while driving, interacting excessively with its author and following his detailed instructions about operational safety and to who to send the funds.  Kurashev meets all the criteria the Ninth Circuit found lacking in *Alhaggagi*.

In discussing this enhancement in *Alhaggagi*, the Ninth Circuit agreed with the Second Circuit's explanation of the term "calculated" in *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010).  *Awan* is instructive in this case too.  Awan provided funds to a terrorist organization called the Khalistan Commando Force (KCF), which aimed to compel the Indian government to allow the creation of a Sikh state and engaged in violent means to meet its aims. *Id*. at 310.  He was convicted of violating 18 U.S.C. § 2339A.  The district court refused to apply the terrorism enhancement because there was evidence that defendant provided the funds because the fundraisers he was giving the money to were influential and important and he wanted to be associated with them.

The Second Circuit explained that the district court focused on the wrong thing—motive rather than "calculation."  "Calculation may often serve motive, but they are not, in fact, identical." *Id*. at 317. "The section is better understood as imposing a requirement that the underlying felony be calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id*. (cleaned up).  As the Second Circuit explained, whatever the defendant's personal motive, it is the desired result of the crime that determines whether the enhancement applies. For example, the murderer of a head of state will certainly know that their conduct will influence government.  That they may commit the murder for other personal reasons is irrelevant.

Kurashev knew what HTS was and what their goals were.  Fayzimatov did not hide the ball.  He proudly showed off weapons and bombs and even interviewed suicide bombers about to set off on their missions.  Like defendant Awan, Kurashev knew HTS would use his money for its violent anti-

GOVERNMENT'S FORMAL OBJECTION
RESPONSE AND SENTENCING MEMO

governmental struggle.  As in *Awan*, the terrorism enhancement applies here.

Notably, another district court recently applied a terrorism enhancement in a case that involved attempting to provide funds to HTS.  The defendant in *United States v. Giampietro,* 614 F. Supp. 3d 612, 614 (M.D. Tenn. 2022), pleaded guilty to concealing the provision of material support in violation of 18 U.S.C. §2339C.  She opposed the application of the terrorism enhancement, claiming she was concealing the money to avoid law enforcement.  The district court noted that HTS aimed to overthrow the Assad regime and establish an Islamic Emirate in Syria, and that it was known as one of the strongest insurgent groups in Syria. *Id*. at 618 (quoting https://cisac.fsi.stanford.edu/mappingmilitants/profiles/hayat-tahrir-al-sham).  The district court concluded that whatever Giampietro's personal motivation was, there was no doubt that Giampietro's actions were calculated to getting two FBI undercovers to Syria so they could provide HTS with funds as well as services.  "All of this was calculated to influence or affect the conduct of the Syrian government (and perhaps the United States Government) through Defendant's material support of HTS." *Id*. at 622. The court therefore applied the enhancement.

Like Giampietro, Kurashev intended to support HTS, an organization that openly aims to replace the Syrian government with an Islamic Emirate through violence.  Unlike Giampietro, who at one point told an undercover that "HTS is no good," *Id.* at 618, Kurashev never questioned or doubted their goals.  If the enhancement applied to the defendant in *Giampietro*, it certainly applies to Kurashev.

The Court should overrule this objection.

## C.    U.S.S.G. § 3A1.4 does not violate due process

Kurashev claims without citation that § 3A1.4 violates due process.  Kurashev faults the terrorism enhancement for being the result of a Congressional directive instead of the result of empirical data. ECF 153 at 6.  He encourages this Court to conclude that the resulting range is therefore greater than necessary.  This strange position elevates the Sentencing Commission over Congress, the body that created it and sets its rules.  Congress recognized that terrorism cases are different and merit unique treatment.  As long as Congress's actions are constitutional, Courts should aim to fulfill Congressional intent.

Kurashev's other complaints about the enhancement are contradicted by his own briefing.  He

argues that the enhancement obliterates the distinction between attempted and completed offense, but the parties are arguing about two points that rest on that difference. He also claims that it is irrational to enhance a crime of terrorism for terrorism. But as the debate over the application of the enhancement here proves, the terrorism enhancement does not automatically apply to every terrorism offense.

Because there is no due process violation, the Court should overrule Kurashev's objection.

### D.    Paragraph 7

The United States does not object to the removal of Paragraph 7 from the PSR.

### E.    The PSR correctly concludes that there are no factors warranting a departure

Kurashev asserts that his lack of criminal history and the application of § 3A1.4 may warrant a downward departure because his criminal history category is overstated and should have been noted by the Probation Officer in paragraph 99. In support of his assertion, Kurashev claims that § 3A1.4 is not based on recidivism studies or relevant data. He cites several district court cases and the Second Circuit opinion in *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) for the proposition that Court has discretion to vary downward under § 4A1.3 if it concludes that the defendant's criminal history or likelihood that he will commit other crime is overstated through the application of § 3A1.4. Although the Ninth Circuit appears not to have ruled on this issue, the United States agrees that the Court retains the discretion to depart downward if either of these factors is met.

Here, neither factor under § 4A1.3 is applicable. Prior to the instant offense, Kurashev admittedly had no criminal history in the United States. However, the crime of which he now stands convicted – attempting to materially support a foreign terrorist organization – is incredibly serious. Kurashev was not lawfully in the United States and was subject to location monitoring by immigration authorities when he committed the current offense. His employment afforded him the means to generate and use approximately $13,000 of disposable income to support HTS in its fight against the Syrian government over a lengthy time period. As the Court already knows, Kurashev's conversations with Fayzimatov evidence a deep emotional commitment to HTS's cause and a desire to give more than just money, namely, to be personally involved in the fighting. But for his arrest in this case, Kurashev would certainly have continued his financial support of HTS for much longer and may likely have gone to Syria to fight. Kurashev's conduct was not a "one off" – it was a deep, abiding, and continuing

commitment and Kurashev showed no signs of ceasing his support of HTS.  On this record, it cannot be said that Kurashev's criminal history category or likelihood of committing further crimes is overstated by the application of § 3A1.4.

The probation officer correctly concluded that there were no factors that supported a downward departure.  The Court should overrule this objection.

## IV.    UNITED STATES' SENTENCING RECOMMENDATION

### A.    18 U.S.C. § 3553(a) Factors

In deciding what sentence to impose on a defendant, after determining the advisory sentencing guidelines, the Court is required to consider the factors enumerated in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment and adequate deterrence, protect the public, and provide education or vocational training for the defendant; (3) the kinds of sentences available; (4) the kinds of sentences and sentencing range set forth in the guidelines; (5) the sentencing guidelines policy statements; (6) avoidance of unwarranted sentencing disparities among similarly situated defendants and (7) providing restitution to victims of the offense.

As discussed above and notwithstanding Kurashev's formal objections, the probation officer correctly applied the advisory sentencing guidelines set out at pages 8-9 of the PSR.  Likewise, the probation officer correctly calculated Kurashev's criminal history. *See* PSR at 10.  Kurashev's advisory guideline range after acceptance of responsibility is 360 months to life (37/VI).  However, because the statutory maximum sentence is below the advisory guideline range, Kurashev's advisory guideline range is 240 months.

### B.    A 240 month sentence is warranted

Kurashev has earned and the Court should impose a 240 month sentence in this case.

#### 1.    Nature and circumstances of the offense

The nature and circumstances of the offense are serious.  Kurashev stands convicted of a federal crime of terrorism for his attempted material support of HTS.  As noted above, Kurashev's actions were not a "one off" but rather occurred over a lengthy period of time and were designed to support HTS's

GOVERNMENT'S FORMAL OBJECTION
RESPONSE AND SENTENCING MEMO

1  continuing fight against the Syrian government.

2        Kurashev's conversations with Fayzimatov demonstrate that Kurashev was well aware that

3  Fayzimatov was not a legitimate journalist but rather a fundraiser, recruiter and propagandist for HTS.

4  Notwithstanding this knowledge, Kurashev still sent approximately $13,000 to Fayzimatov through

5  trusted intermediaries in Turkey.  According to Forbes.com, the current exchange rate is one U.S. dollar

6  to 2513 Syrian pounds[13] which makes $13,000 an extremely substantial level of financial support for

7  HTS.

8        Furthermore, evidence gathered by the FBI supports that Fayzimatov received the money sent by

9  Kurashev.  For example, the Abu Salim video demonstrates that Kurashev's financial contributions

10  provided significant assistance for the purchase of the motorcycle for HTS fighters to use on the front

11  lines.  Similarly, Fayzimatov's connecting the CYOP and Kurashev to facilitate the recruitment of

12  another money transfer source strongly suggests that Kurashev's money transfers were successful.

13  Fayzimatov even describes Kurashev to the CYOP as a "good and trustworthy brother."  During later

14  contact with the CYOP, Kurashev shares the benefit of his money transferring experience.  It is hard to

15  conceive of a situation where Fayzimatov's confidence in and praise of Kurashev is premised on

16  something other than the successful (and substantial) transfer of funds in support of HTS.

17          2.      History and characteristics

18        Kurashev's actions undercut any suggestion that his history and characteristics warrant a lesser

19  sentence.  Although Kurashev attempts to present himself as a family man who provides for his family

20  and is simply concerned about the war in Syria, as the Court knows from prior hearings, his intentions

21  were not benign.  Kurashev conversations with Fayzimatov are couched in terms of Kurashev's financial

22  contributions being equal to personally engaging in violent jihad in Syria.  Kurashev discusses his

23  longing for the "ribats" (or fortifications) and he was "trying to act only with [t]he intent [for jihad]."

24  *See* PSR at 7.

25        Kurashev will no doubt point to his experience with the Russian FSB in mitigation of his

26  actions, however, that experience provides a powerful incentive to provide material support to HTS.

27

28      [13] *See* https://www.forbes.com/advisor/money-transfer/currency-converter/usd-syp/?amount=1&from_currency=USD&to_currency=SYP (accessed on April 21, 2024)

GOVERNMENT'S FORMAL OBJECTION
RESPONSE AND SENTENCING MEMO

1   Additionally, Kurashev's heavy consumption of violent extremist content, including an HTS recruiting

2   video containing images of fighters and battles suggests a darker motive for his actions. Kurashev even

3   went so far as to delete his messages to Fayzimatov and to obfuscate his internet usage to avoid

4   detection. These are not the actions of someone who is concerned with journalistic freedom and shining

5   a light on the Syrian conflict. Indeed, Kurashev has shown little remorse for his actions. His statement

6   in the PSR about finding another way to help the Syrian people flies in the face of his actions and his

7   conversations with Fayzimatov. *See* PSR at 8.

8               3.    Seriousness of the offense, respect for the law and just punishment

9          As discussed throughout this memorandum, Kurashev's conduct was very serious. His actions

10  and conversations with Fayzimatov indicate that he was more concerned whether financial support was

11  tantamount to being personally present in Syria to engage in violent jihad. Kurashev knew he was

12  breaking the law but simply did not care. A 240 month sentence is not greater than necessary to

13  promote respect for the law and to secure a just punishment.

14              4.    Unwarranted sentencing disparity

15         The United States expects that Kurashev may argue that a sentence of 240 months will result in

16  sentencing disparity when compared to other material support cases in this district. *See United States v.*

17  *Teausant,* EDCA No. 2:14-CR-00087 JAM and *United States v. Jameson*, EDCA No. 1-18-CR-00001

18  LJO. The defendant in *Teausant* was sentenced to 12 years in federal prison after the Court concluded

19  that the government's recommended 9 year sentence was insufficient. The defendant in *Jameson*

20  received a 15 year sentence. Although the defendants in these cases were charged with attempted

21  material support, the similarities end there. Both cases were the result of undercover operations and

22  entered into negotiated specific sentence plea agreements under Fed.R.Crim.P. 11(c)(1)(C). Teausant

23  attempted to travel to Syria and was arrested at the Canadian border. Jameson conspired with an

24  undercover law enforcement agent to blow up Pier 39 in San Francisco and later attempted to withdraw

25  from the conspiracy. Neither attempt materially supported a foreign terrorist organization to the same

26  degree as Kurashev's financial support of HTS.

27         Here, there is no indication that Kurashev would have ceased his support of HTS had he not been

28  arrested. He engaged in a relatively sophisticated scheme to send money overseas to HTS through

GOVERNMENT'S FORMAL OBJECTION
RESPONSE AND SENTENCING MEMO

17

Fayzimatov's trusted intermediaries.  The money Kurashev sent made it to Fayzimatov and was used in HTS's fight against the Syrian government.  Kurashev's actions had real impact, unlike Teausant and Jameson.  Kurashev held a deep and abiding belief in the righteousness of HTS's actions against the Syrian government.

**V.**    **CONCLUSION**

For all of the foregoing reasons, the Court should impose a sentence of 240 months followed by an appropriate term of supervised release.

Dated:  April 22, 2024                              PHILLIP A. TALBERT
                                                    United States Attorney


                                            By:   /s/ HEIKO P. COPPOLA
                                                    HEIKO P. COPPOLA
                                                    Assistant United States Attorney

                                                    DMITRIY SLAVIN
                                                    Trial Attorney